## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

**YOUR STANDING INTERNATIONAL, INC.**

       **Plaintiff,**

**v.**

**THE UNITED STATES,**

       **Defendant,**

**and**

**MID CONTINENT STEEL & WIRE, INC.,**

       **Defendant-Intervenor.**

**Court No. 24-00055**

## RESPONSE OF DEFENDANT-INTERVENOR IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Rosa S. Jeong
Claudia Hartleben Dunsch
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC  20037
(202) 331-3100 (Phone)
(202) 331-3101 (Fax)

*Counsel for Defendant-Intervenor Mid Continent Steel & Wire, Inc.*

November 1, 2024

# TABLE OF CONTENTS

STATEMENTS PURSUANT TO RULE 56.2(c)(2) .................................................. 1

ADMINISTRATIVE DETERMINATION TO BE REVIEWED ............................................. 1

STATEMENT OF THE ISSUES ................................................................ 1

STATEMENT OF FACTS ..................................................................... 2

SUMMARY OF ARGUMENT .................................................................... 6

ARGUMENT .............................................................................. 8

I.   STANDARD OF REVIEW ................................................................ 8

II.  COMMERCE'S SELECTION OF SURROGATE FINANCIAL DATA WAS
     SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD AND WAS IN
     ACCORDANCE WITH LAW ............................................................... 9

     A.   Legal Standard .............................................................. 9

     B.   The Law Does Not Require that Surrogate Financial Data Selected Under Prong (iii)
          of the Statute Reflect Sales in the Home Market .............................. 11

     C.   Substantial Evidence Supports Commerce's Selection of San Shing's Financial
          Statements to Calculate CV Profit and ISE Under Prong (iii) ................... 13

III. YS IS PRECLUDED FROM RAISING NEW ARGUMENTS BEFORE
     THE COURT ......................................................................... 16

     A.   YS's Argument that Commerce Did Not Consider the Customer Base is Precluded
          Under the Exhaustion Doctrine ................................................ 16

     B.   Even if This Court Considers the New Argument, Commerce's Decision is Still
          Supported by Substantial Evidence on the Record .............................. 19

IV.  CONCLUSION ......................................................................... 21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Akzo N.V. v. United States Int'l Trade Comm'n*,
808 F.2d 1471 (Fed. Cir.1986)..................................................................................9

*Boomerang Tube LLC v. United States*,
856 F.3d 908 (Fed. Cir. 2017)..................................................................................16

*Ceramica Regiomontana, S.A. v. United States*,
10 CIT 399 (1986) ......................................................................................................9

*Consol. Bearings Co. v. United States*,
166 F. Supp. 2d 580 (Ct. Int'l Trade 2001) ............................................................16

*Consolidated Edison Co. v. NLRB*,
305 U.S. 197 (1938).....................................................................................................9

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007)................................................................................17

*Dorbest Ltd v. United States*,
604 F.3d 1363 (Fed. Cir. 2010).................................................................................16

*Ellwood City Forge Co. v. United States*,
582 F. Supp. 3d 1259 (Ct. Int'l Trade 2022) .............................................8, 16, 17

*FMC Corp. v. United State*s,
27 CIT 240 (2003) ....................................................................................................10

*Fujitsu Gen'l Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996)....................................................................................8

*Grobest & I-Mei Indus. (Vietnam) v. United* States, 815 F. Supp. 2d 1342 (Ct. Int'l
Trade 2012)..........................................................................................................10, 11

*Inland Steel Indus., Inc. v. United States*,
188 F.3d 1349 (Fed. Cir. 1999)..................................................................................9

*Kearns v. Chrysler Corp.*,
32 F.3d 1541 (Fed. Cir. 1994).....................................................................................9

*Mid Continent Steel & Wire, Inc. v. United States*,
551 F. Supp. 3d 1360 (Ct. Int'l Trade 2021) .........................................................12

*Nexteel Co. v. United States,*
28 F.4th 1226 (Fed. Cir. 2022) ..............................................................8

*Ningbo Dafa Chem. Fiber Co. v. United States,*
580 F.3d 1247 (Fed. Cir. 2009)............................................................7, 9

*Rhone Poulenc, Inc. v. United States,*
899 F.2d 1185 (Fed. Cir. 1990)..............................................................17

*Technoimportexport, UCF America Inc. v. United States,*
783 F. Supp. 1401 (Ct. Int'l Trade 1992) ...............................................11

*Thai I-Mei Frozen Foods Co., Ltd v. United States,*
477 F. Supp. 2d 1332 (Ct. Int'l Trade 2007) ..........................................11

*Venus Wire Indus. Pvt. v. United States,*
471 F. Supp. 3d 1289 (Ct. Int'l Trade 2020) ..........................................16

*Xiping Opeck Food Co. v. United States,*
551 F. Supp. 3d 1339 (Ct. Int'l Trade 2021) ..........................................17

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,*
652 F.3d 1333 (Fed. Cir. 2011)..........................................................11, 20

*Zhejiang Mach. Imp. & Exp. Corp. v. United States,*
471 F. Supp.3d 1313 (Ct. Int'l Trade 2020) ...........................................17

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B) .....................................................................8

19 U.S.C. § 1677b(e)(2)(A) ...........................................................9, 11, 13

19 U.S.C. § 1677b(e)(2)(B) ...............................................................11, 12

19 U.S.C. § 1677b(e)(2)(B)(i) and (ii) ...................................................13

19 U.S.C. § 1677b(e)(2)(B)(iii) .......................................................*passim*

28 U.S.C. § 2637(d) ...............................................................................16

28 U.S.C. § 2639(a) .................................................................................8

**Regulations**

19 C.F.R. § 351.309(c)-(d)......................................................................16

**Administrative Decisions**

*Certain Oil Country Tubular Goods from the Republic of Korea, Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances,* 79 Fed. Reg. 41,983 (July 18, 2014) ...................15

*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019,* 86 Fed. Reg. 14,309 (Mar. 15, 2021)...........................................................13

*Certain Steel Nails from Taiwan: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Determination of No Reviewable Sales; 2021-2022,* 89 Fed. Reg. 6,503 (Feb. 1, 2024) ..........................................................................................................1, 5, 14

*Notice of Final Determination of Sales at Less than Fair Value: Pure Magnesium From Israel,* 66 Fed. Reg. 49, 349 (Sept. 27, 2001) .........................................12, 18

*Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers from Malaysia,* 69 Fed. Reg. 20, 592 (Apr. 16, 2004) ..........................................................................................................12, 18

## STATEMENTS PURSUANT TO RULE 56.2(c)(2)

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Defendant-Intervenor Mid Continent Steel & Wire, Inc. (hereinafter, "Mid Continent") respectfully submits this Response in Opposition to Plaintiff Your Standing International, Inc.'s ("Plaintiff" or "YS") Motion for Judgment on the Agency Record (ECF No. 23) and Memorandum of Points and Authorities in Support of Plaintiff's 56.2 Motion for Judgment on the Agency Record (ECF No. 23-2) (hereinafter "YS Brief").

## ADMINISTRATIVE DETERMINATION TO BE REVIEWED

The administrative determination on appeal is the U.S. Department of Commerce's ("Commerce") final determination in *Certain Steel Nails from Taiwan: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Determination of No Reviewable Sales; 2021-2022*, 89 Fed. Reg. 6,503 (Dep't Commerce Feb. 1, 2024) ("*Final Results*") (Public Record ("P.R.") 133).

## STATEMENT OF THE ISSUES

1.      Whether Commerce's selection of Taiwanese enterprise San Shing Fastech Corporation's ("San Shing") financial statements as one of two sources to calculate YS's constructed value ("CV") profit and indirect selling expenses ("ISE"), where (i) the vast majority of San Shing's profit is derived from sales of comparable merchandise to steel nails, and (ii) San Shing's contemporaneous sales of comparable merchandise in the home market of Taiwan were material – in this case, over ten percent of annual revenue is supported by substantial evidence and is in accordance with law.

2.      Whether YS is precluded from raising an argument under one factor of Commerce's surrogate financial data selection methodology under 19 U.S.C. § 1677b(e)(2)(B)(iii), where it did not raise the argument before Commerce in the administrative review, and Plaintiff has neither

1

claimed nor demonstrated that doing so would have been futile or that it was otherwise not required to exhaust administrative remedies before the agency.

## STATEMENT OF FACTS

YS, the sole participating respondent in the administrative review at issue, had no viable comparison market for sales of merchandise under consideration. Thus, Commerce based the dumping margin calculation on CV and, under 19 U.S.C. § 1677b(e)(2)(B)(iii), determined the CV profit and indirect selling expenses using the financial statements of two Taiwanese producers San Shing and Chun Yu Works & Co., Ltd. ("Chun Yu"). *See* Memorandum to Deputy Assistant Secretary for Enforcement and Compliance from Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, Subject: Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Certain Steel Nails from Taiwan; 2021-2022 (Jan. 26, 2024) ("Final IDM") at Comment 1 (P.R. 128). The sole issue on appeal concerns the reasonableness of Commerce's inclusion of San Shing to calculate YS's CV profit and ISE.

To calculate CV profit and ISE, Commerce analyzed the financial statements of four entities, two of which – San Shing and Chun Yu – are Taiwanese producers of fasteners. *See* Memorandum to Assistant Secretary for Enforcement and Compliance from Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, re: Decision Memorandum for the Preliminary Results of the Administrative Review of the Antidumping Duty on Certain Steel Nails from Taiwan; 2020-2021 (Jul. 28, 2023) ("Prelim IDM") at 20 (P.R. 98); *see also* Letter from Greenberg Traurig LLP to Sec'y Commerce, re: Certain Steel Nails from Taiwan – Comments for Constructed Value Profit and Selling Expenses (May 31, 2023) ("Mid Continent CV Profit Comments") at Exhibits 4 and 6 (P.R. 82). In 2022, San Shing earned more than 62 percent of revenue from third country sales, 27 percent from U.S. sales, and 10 percent from the home market of Taiwan. *See id*. at Exhibit 4, p. 62 (P.R. 82).

Based on its analysis, Commerce preliminarily selected the 2022 financial statements of San Shing and Chun Yu as the source for valuing CV profit and ISE, because "these statements are contemporaneous with the POR, reflect the experience of profitable Taiwanese producers of nails and other comparable merchandise, show that a significant portion of sales revenue was derived from the domestic market, and do not reflect specific countervailable subsidy programs." Prelim IDM at 20 (P.R. 98). Commerce concluded that both companies predominantly produced identical or comparable products, explaining: "San Shing is a Taiwanese producer of fasteners, including bolts, nuts, and toolings, which we find to be products comparable to the subject merchandise. Similarly, Chun Yu is a Taiwanese producer of fasteners, including bolts, screws, and studs, which we find to be products comparable to the subject merchandise." *Id*. (P.R. 98). Accordingly, Commerce calculated a simple average of profit and ISE of the two selected financial statements to value YS's CV profit and ISE. *See id*. at 21 (P.R. 98).

In its case brief before Commerce, YS argued Commerce erred in preliminarily selecting San Shing's financial statements to calculate its CV profit and ISE. *See* Letter from Appleton Luff Pte Ltd to Sec. Commerce, re: Nails from Taiwan: Case Brief (Jan. 3, 2024) ("YS Case Brief") (P.R. 120). First, YS claimed that San Shing is primarily devoted to producing automotive parts, which Commerce had previously found not comparable to steel nails; and second, San Shing lacked material sales in Taiwan. *See id*. at 2-4 (P.R. 120). YS urged Commerce to calculate CV profit and ISE in the final results using only Chun Yu's financial statements. *See id*. at 4 (P.R. 120).

To support its first claim, YS referred to the decision in the original investigation in which Commerce rejected the financial statements of a company called Sundram based, in part, on the finding that the company produced various car parts that were not comparable to steel nails. *See*

*id*. at 2 (P.R. 120) (citation omitted). YS argued Commerce should decline to rely on San Shing's financial statements in the final results because "San Shing is focused on automotive parts, much as was the case for Sundram in the original investigation{.}" *Id*. at 3 (P.R. 120). To supposedly illustrate San Shing's "focus" on automotive parts, YS referred to San Shing's website, which describes its "**Automotive** Bold Production Line" with which it has developed "screws and bolts for supply to major **carmakers** in Europe and America." *Id*. (P.R. 120) (emphasis added in case brief) (citing Mid Continent CV Profit Comments at Exhibit 3 (P.R. 82)).

To support its second claim, YS argued that "only a small portion of San Shing's sales was actually made in Taiwan." *Id*. (P.R. 120) (citing Mid Continent CV Profit Comments at Exhibit 4, p. 64 (P.R. 82)). YS claimed that San Shing's profit ratio was "largely based on sales to the United States" and therefore was not reflective of sales in the home market. *Id*. (P.R. 120).

In rebuttal, Mid Continent pointed out that San Shing is not focused on producing car parts at all and that YS's claims mischaracterized the facts. *See* Letter from Greenberg Traurig, LLP to Sec. Commerce, re: Certain Steel Nails from Taiwan – Rebuttal Brief (Jan. 8, 2024) ("Mid Continent Rebuttal Brief") (P.R. 122). Specifically, San Shing's website stated that it produces fastener products, including nuts, bolts, washers, toolings, and machinery, which Commerce had repeatedly found to be comparable to steel nails for purposes of its financial ratio analysis. *See id*. at 5 (P.R. 122). Mid Continent also explained that it was another mischaracterization to describe San Shing's revenues as being "largely based on sales to the United States{.}" In fact, San Shing's markets were diverse, and the United States was not the "predominant" export market from which San Shing derived revenue. *See id*. at 6 (P.R. 122).

In the *Final Results*, Commerce comprehensively addressed YS's arguments. First, in analyzing whether San Shing's business operations and products were sufficiently similar to those

of the respondent, Commerce found the administrative record indicated that San Shing was a Taiwanese producer of "fastener products, including nuts, bolts, washers, toolings, and machinery" and "{t}here is no information on the record that demonstrates that San Shing is manufacturing automobile parts beyond the fasteners described in its bolt production line." Final IDM at Comment 1, p. 6 (P.R. 128). On this basis, Commerce concluded that San Shing produced comparable merchandise, *i.e.,* fasteners, that are similar to YS's steel nails. *See* Final IDM at Comment 1, p. 6 (P.R. 128).

Second, Commerce carefully considered YS's argument that the United States was San Shing's largest market and, therefore, the surrogate financial revenue was not reflective of sales to the home market. Final IDM at Comment 1, p. 6 (P.R. 128). Commerce explained that it excludes surrogate financial data that contains "exclusively or predominantly" U.S. sales to avoid using profit rates that are affected by the alleged dumping. Final IDM at Comment 1, p. 6 (P.R. 128). Commerce reasoned that the record did not demonstrate that San Shing's sales were either predominantly or exclusively to the U.S. market that were potentially affected by dumping. Final IDM at Comment 1, p. 7 (P.R. 128). San Shing's financial statements showed that over 70 percent of San Shing's sales were made in markets outside the United States, explained Commerce, dispelling the claim that San Shing's financial statements primarily reflect sales to the United States such that would warrant their exclusion from CV profit and selling expense rate calculations. Final IDM at Comment 1, p. 7 (P.R. 128).

Based on its thorough consideration of the financial data on the record, Commerce calculated YS's CV profit and ISE based on a simple average of the data from San Shing and Chun Yu's 2022 financial statements. *See id*. (P.R. 128).

# SUMMARY OF ARGUMENT

Plaintiff raises two arguments on appeal, the first of which is based on a mistaken interpretation of the law and facts on the administrative record, and the second of which is precluded under the exhaustion doctrine as Plaintiff failed to raise the argument in its case brief before Commerce in the administrative review.

Plaintiff argues the surrogate financial statements that Commerce selected are unsuitable because they do not reflect sales in the home market of Taiwan. YS Brief at 9-10. YS's claims are disconnected from the law that governs Commerce's selection of surrogate financial data and the record evidence.

Commerce relied on prong (iii) of the statutory provision governing the calculation of constructed value for profit and indirect selling expenses, because the data was unavailable to rely on other methods provided by the statute. *See* Final IDM at Comment 1 (P.R. 128). Under prong (iii), Commerce uses "any other reasonable method" to select the surrogate financial data used to calculate CV profit and ISE. 19 U.S.C. § 1677b(e)(2)(B)(iii). The statute does not require that surrogate financial data reflect the respondent's home market, nor does it qualify Commerce's selection on any geographical basis. *See id.* Plaintiff's claim that the surrogate financial data must reflect the home market of Taiwan is not supported by the law.

In addition, Commerce's longstanding methodology for selecting surrogate financial data under 19 U.S.C. § 1677b(e)(2)(B)(iii) does not require the surrogate data be derived from the respondent's home market. Among other factors, Commerce analyzes the extent to which a potential surrogate has sales in the United States to avoid selecting a surrogate that "exclusively or predominantly" sells to the United States, as such sales may be affected by the alleged dumping. Final IDM at Comment 1, p. 6 (P.R. 128).

The Court should affirm Commerce's selection of surrogate financial statements used to calculate Plaintiff's CV profit and ISE "if supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1262 (Fed. Cir. 2009) (citations and internal quotations omitted). In its decision, Commerce explained that the surrogate company's sales revenue was not exclusively or predominantly from sales in the U.S. market that were potentially affected by dumping. *See* Final IDM at Comment 1, p. 6 (P.R. 128). It further found that based on the country-specific revenue shown in the surrogate financial statements the vast majority of the surrogate's sales were made in Taiwan or third-country markets. *See id*. at Comment 1, p. 7 (P.R. 128). Commerce's rationale was clear and amply supported by the record evidence. Plaintiff's argument that the surrogate financial statements should be reflective of the home market of Taiwan is not grounded in the statute and Plaintiff has not identified any evidence that would sufficiently detract from Commerce's finding so as to render its selection unreasonable.

Plaintiff's second argument on appeal is that the surrogate financial statements should be disqualified because the surrogate company and YS do not have similar customer bases. The Court should disregard this argument because YS did not raise it before Commerce and thus failed to exhaust its administrative remedies. *See* YS Case Brief (P.R. 120).

The exhaustion doctrine requires all arguments be presented before the administering agency, and it is insufficient to broadly raise an issue before the agency only to refine it on appeal. *See Ellwood City Forge Co. v. United States*, 582 F. Supp. 3d 1259, 1273 (Ct. Int'l Trade 2022). Here, Plaintiff's argument challenging the comparability of customer bases is precluded because it was not raised in any form before Commerce, nor has Plaintiff demonstrated that it would have been futile to raise it for Commerce's consideration.

For these reasons, both of Plaintiff's arguments should be dismissed in their entirety, and Commerce's selection of surrogate financial data affirmed.

**ARGUMENT**

## I.    STANDARD OF REVIEW

Under 19 U.S.C. § 1516a(b)(1)(B), courts "must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen'l Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). The U.S. Court of Appeals for the Federal Circuit ("CAFC") has explained that when "'identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute,' {the court} recognize{s} the technical expertise of the agency and give{s} it deference 'both greater than and distinct from that accorded to the agency in interpreting the statutes it administers.'" *Nexteel Co. v. United States*, 28 F.4th 1226, 1233 (Fed. Cir. 2022) (citing *Fujitsu*, 88 F.3d at 1039 (Fed. Cir. 1996)). Further, it is the appellant's burden to prove that Commerce's actions were not in accordance with the law. *See* 28 U.S.C. § 2639(a) ("{I}n any civil action commenced in the Court of International Trade under section . . . 516A of the Tariff Act of 1930, the decision of . . . the administering authority . . . is presumed to be correct. The burden of proving otherwise shall rest upon the party challenging such decision.").

"Substantial evidence is a deferential standard of review, which requires only that a determination be supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1262 (Fed. Cir. 2009) (citations and internal quotations omitted). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose

its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States,* 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986), *aff'd* 810 F.2d 1137 (Fed. Cir. 1987) (citations omitted). It is a "limited standard of review" that does not allow the court to substitute its judgment for that of Commerce or "allow the parties to retry factual issues." *Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999) (citing *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938); *Akzo N.V. v. United States Int'l Trade Comm'n,* 808 F.2d 1471, 1487 (Fed. Cir. 1986); *Kearns v. Chrysler Corp.,* 32 F.3d 1541, 1548 (Fed. Cir. 1994)).

## II.  COMMERCE'S SELECTION OF SURROGATE FINANCIAL DATA WAS SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD AND WAS IN ACCORDANCE WITH LAW

### A.  Legal Standard

Under section 773(e)(2)(A) of the Tariff Act of 1930 (the "Act"), codified at 19 U.S.C. § 1677b(e)(2)(A), the preferred method for calculating CV profit and ISE is to base them on the "actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits in connection with the production and sale of a foreign like product, in the ordinary course of trade for consumption in the foreign country." If, however, the respondent does not a viable comparison market and thus the actual CV profit and ISE for the foreign like product cannot be calculated, section 773(e)(2)(B)(iii) of the Act, codified at 19 U.S.C. § 1677b(e)(2)(B)(iii), directs Commerce to select among three alternatives as follows:

(i)     the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

(ii)    the weighted average of the actual amounts incurred and realized by

exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii)    the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer describe in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

In the administrative review under appeal, Commerce was unable to select prongs (i) or (ii) because YS did not have any sales in the comparison market of merchandise that is in the same general category of products as the subject merchandise, and there were no other respondents participating in the review. Thus, Commerce selected the alternative under prong (iii), i.e., "any other reasonable method." *See* Final IDM at Comment 1 (P.R. 128). YS has not challenged Commerce's selection of prong (iii).

Under this prong, Commerce has ample discretion in selecting a suitable proxy for the calculation of CV profit and ISE. Selection of surrogate financial data is inherently a fact-specific decision, for which Commerce enjoys "wide discretion." *See Grobest & I-Mei Indus. (Vietnam) v. United* States, 815 F. Supp. 2d 1342, 1351 (Ct. Int'l Trade 2012) ("Commerce has wide discretion in selecting surrogate value data."). This Court has also explained that "{w}hen is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly." *FMC Corp. v. United State*s, 27 CIT 240, 251 (2003) (citing *Technoimportexport, UCF America Inc. v. United States*, 783 F. Supp. 1401, 1406 (Ct. Int'l Trade 1992)). "{The} court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Grobest,* 815 F. Supp. 2d at 1351

(citing *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011)).

YS's appeal rests on an erroneous interpretation of the law to which it misapplies the facts that Commerce reviewed and reasonably found to satisfy the criteria for selection of surrogate financial data. Commerce's calculation of CV profit and indirect selling expenses is supported by substantial evidence on the record and is in accordance with law.

### B. The Law Does Not Require that Surrogate Financial Data Selected Under Prong (iii) of the Statute Reflect Sales in the Home Market

YS contends the surrogate financial ratios to calculate the respondent's CV profit and ISE ratios must reflect sales in the home market. *See* YS Brief at 9 ("The first factor that renders San Shing an unsuitable surrogate . . . is that its financial statements did not reflect sales in the home market of Taiwan."). On the contrary, section 773(E)(2)(B)(iii) of the Act, 19 U.S.C. § 1677b(e)(2)(B)(iii), does not require that surrogate financial data reflect any sales in the home market.

Where the preferred method under section 773(E)(2)(A) of Act, 19 U.S.C. § 1677b(e)(2)(A), as well as prongs (i) and (ii) under section 773(E)(2)(B) of the Act, 19 U.S.C. § 1677b(e)(2)(B), are unavailable, prong (iii) permits Commerce to rely on any "reasonable method." Thus, prong (iii) does not require the surrogate financial data to reflect sales in the home market or any particular market. *See* 19 U.S.C. § 1677b(e)(2)(B)(iii). This Court has explained that clause (iii) does not contain a geographical restriction or qualification. *See Thai I-Mei Frozen Foods Co., Ltd v. United States*, 477 F. Supp. 2d 1332, 1343 (Ct. Int'l Trade 2007) ("Although clause (ii) of § 1677b(e)(2)(B) contains a geographical restriction that is imposed by the inclusion of the term 'foreign country,' clause (iii) imposes no such general restriction and instead allows profit to be calculated by 'any other reasonable method,'. . . .") (citation omitted). Under the

statute, "any other reasonable method" may include the financial statements from a third-country company. *See Mid Continent Steel & Wire, Inc. v. United States*, 551 F. Supp. 3d 1360, 1362 (Ct. Int'l Trade 2021).

Furthermore, Commerce's longstanding methodology under prong (iii) does not require the surrogate financial data reflect sales in the home market. Developed through its extensive practice of selecting surrogate financial data, Commerce considers the following criteria:

> (1) the similarity between a potential surrogate's business operations and products and the products and operations of the respondent;
>
> (2) the extent to which a potential surrogate has sales in the United States and the home market;
>
> (3) the contemporaneity of the surrogate data; and
>
> (4) the similarity of the customer base between a potential surrogate and the respondent.

*Notice of Final Determination of Sales at Less than Fair Value: Pure Magnesium From Israel*, 66 Fed. Reg. 49,349 (Dep't Commerce Sep. 27, 2001), and accompanying Issues and Decision Memorandum at Comment 8 ("*Pure Magnesium from Israel*"); *see also Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20, 592 (Dep't Commerce Apr. 16, 2004), and accompanying Issues and Decision Memorandum at Comment 26 ("*Color TVs from Malaysia*"). With respect to the second criterion, Commerce's main concern is not constructing a normal value that is based on financial data that contains "exclusively or predominantly U.S. sales." *Pure Magnesium from Israel* at Comment 8. As explained in the Final IDM, Commerce prefer to not use surrogate financial data that contains "exclusively or predominantly" U.S. sales to avoid using profit rates that are affected by the alleged dumping. Final IDM at Comment 1, p. 6 (P.R. 128).

In advancing its position that San Shing's financial statements are unsuitable for a lack of sales in the home market of Taiwan, YS seems to conflate other methods provided under the statute such as 19 U.S.C. § 1677b(e)(2)(A) and 19 U.S.C. § 1677b(e)(2)(B)(i) and (ii), under which CV profit and ISE are based on amounts incurred in the home market. However, it is undisputed that the necessary data is unavailable on the record to apply any of the other statutory methods for valuing CV profit and ISE. Where, as here, CV profit and ISE are calculated based on prong (iii), there is no requirement to select data from any particular market. 19 U.S.C. § 1677b(e)(2)(B)(iii). Instead, Commerce's selection is guided by the four factors enumerated above, which follow the statutory imperative of reasonableness but – like the statute – impose no requirement that surrogate financial data reflect sales in any comparison market.

### C. Substantial Evidence Supports Commerce's Selection of San Shing's Financial Statements to Calculate CV Profit and ISE Under Prong (iii)

Substantial evidence supports Commerce's selection of surrogate financial data to calculate YS's CV profit and ISE. First, YS does not dispute in this appeal that San Shing's financial revenue is for products in the same general category of products as steel nails – namely fastener products, including nuts, bolts, washers, toolings, and machinery. *See* Mid Continent CV Comments at Exhibit 3 (P.R. 82). In numerous other cases involving steel nails, Commerce repeatedly concluded fasteners "to be comparable to steel nails because they are used in similar applications (*e.g.*, the fastening of wood in building homes), have a similar production process to that of steel nails, and thereby, have similar cost structures as well as marketplaces subject to the same pricing conditions." *See*, *e.g.*, *Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 14,309 (Dep't Commerce Mar. 15, 2021), and accompanying Issues and Decision Memorandum at 15. San Shing's financial statements show that revenue from fastener sales

accounted for 87 percent of its revenue in 2022. *See* Final IDM at 6 (P.R. 128) (citing Mid Continent CV Comments at Exhibit 4, p. 62 (P.R. 82)). Thus, San Shing's revenue is without question representative of sales of merchandise comparable to steel nails.[1]

The surrogate data also comport with Commerce's criterion that sales revenue not be derived "exclusively or predominantly" from sales to the United States. In the *Final Results*, Commerce analyzed San Shing's sales revenue and confirmed that the vast majority of its sales revenue was not derived exclusively or predominantly from sales to the U.S. market. *See* Final IDM at Comment 1, p. 7 (P.R. 128).

Commerce explained that the presence of U.S. sales as a source of revenue was not a disqualifier: "The rationale for the exclusion of 'exclusively or predominantly' U.S. sales is the avoidance of using profit rates 'drawn almost exclusively from the allegedly dumped sales under investigation,' where the U.S. market is alleged to have been affected by significant dumping." Final IDM at Comment 1, p. 7 (P.R. 128). The record before it, however, did "not demonstrate that San Shing's sales were either predominantly or exclusively U.S. sales that were potentially affected by dumping." *Id.* Commerce further reasoned that, while San Shing's financial statements reflected the United States as the largest individually identified revenue market, "over 70 percent

---

[1] YS asserts that "San Shing also reported that it largely sells most of its fastener merchandise, in the form of automotive bolts, to carmakers in Europe and the United States. Therefore, it is highly plausible that San Shing's sales to the Taiwan market consisted of sales of this non-comparable merchandise." YS Brief at 11. Record evidence, which contains excerpts of San Shing's website, shows the company produces, among other types of fasteners such as bolts, nuts, and washers, automotive bolts that are sold to carmakers. *See* Mid Continent CV Profit Comments at Exhibit 3 (P.R 82). Its fastener business accounted for 87% of its revenue in 2022. Mid Continent CV Profit Comments at Exhibit 4 (p. 62) (P.R. 82). No where does San Shing represent that most of its fastener merchandise sales are in the form of automotive bolts to carmakers in Europe and the United States. *See id.* at Exhibits 3 and 4, p. 62 (P.R. 82). YS's interpretation of the evidence is misleading and should be disregarded. Moreover, there is no evidence showing that automotive bolts are not considered to be comparable to subject merchandise.

of its sales to non-affiliated entities were either Taiwan or third-country markets during the POR." Final IDM Comment 1, at p. 7 (P.R. 128).

Commerce's decision in this case fits comfortably in the context of surrogate financial statements selected in other cases. In *OCTG from Korea*, Commerce similarly selected financial statements of Tenaris, which reflected sales predominantly to non-U.S. locations. *See Certain Oil Country Tubular Goods from the Republic of Korea, Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances,* 79 Fed. Reg. 41,983 (Dep't Commerce July 18, 2014), and accompanying Issues and Decision Memorandum at Comment 1. Tenaris's sales to the U.S. market constituted nearly half of its sales and there was no indication that its home market sales were substantial. *Id.*

Here, San Shing's sales were not predominantly or exclusively to the United States. Its U.S. sales represented only 27 percent of revenue in 2022. *See* Mid Continent CV Profit Comments at Exhibit 4, p. 62 (P.R. 82). Commerce's selection of surrogate financial statements is based on the totality of circumstances and not on a bright-line numerical threshold with respect to any single factor. That said, 27 percent cannot be reasonably deemed to represent "predominant" or "exclusive" proportion of sales.

YS's theory that San Shing's financial statements should be disqualified for the presence of U.S. market revenue was considered and dismissed by Commerce. San Shing's experience as a Taiwanese producer of comparable merchandise is representative and Commerce considered that San Shing's financial statements were the best available information on the record for calculating the CV profit and ISE. Commerce's decision should be affirmed.

**III. YS IS PRECLUDED FROM RAISING NEW ARGUMENTS BEFORE THE COURT**

**A. YS's Argument that Commerce Did Not Consider the Customer Base is Precluded Under the Exhaustion Doctrine**

Where appropriate, this Court shall require the exhaustion of administrative remedies. 28 U.S.C. § 2637(d). Under the exhaustion doctrine, a party is required to "present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court of International Trade." *Consol. Bearings Co. v. United States*, 166 F. Supp. 2d 580, 585 (Ct. Int'l Trade 2001). "While exhaustion is not jurisdictional, . . . the statute 'indicates a congressional intent that, absent a strong contrary reason, the {CIT} should insist that parties exhaust their remedies before the pertinent administrative agencies.'" *Venus Wire Indus. Pvt. v. United States*, 471 F. Supp. 3d 1289, 1304 (Ct. Int'l Trade 2020) (citing *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017)) (internal citations omitted). This means that a party is to "present 'all arguments' in its administrative case brief before raising those issues before this Court," enabling the agency to address the issue in the first instance, prior to judicial review. *Id.* at 1304 (referencing 19 C.F.R. § 351.309(c)-(d); *Dorbest Ltd v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010); *Boomerang*, 856 F.3d at 912-13).

This Court has emphasized the requirement that parties present "all arguments" in the final brief submitted to Commerce "or forever hold their peace." *Ellwood City Forge Co. v. United States*, 582 F. Supp. 3d 1259, 1273 (Ct. Int'l Trade 2022). The purpose of this requirement is threefold: (i) recognizing that an agency ought to have an opportunity to correct its own mistakes; (ii) promoting judicial efficiency because exhaustion requires parties to make arguments first before the agency that the agency may then moot before they reach court; (iii) producing a useful record for subsequent judicial consideration, especially in a complex or technical factual context. *Id.*

Moreover, the Court has distinguished between mentioning a "broad issue" in Commerce's case brief and actually exhausting administrative remedies by raising a "particular argument" before the agency. Hence, "respondents do not meet exhaustion requirements 'by merely mentioning a broad issue without raising a particular argument.'" *Xiping Opeck Food Co. v. United States*, 551 F. Supp. 3d 1339, 1352 (Ct. Int'l Trade 2021) (citing *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313, 1338 (Ct. Int'l Trade 2020)). Rather, the requirement to exhaust administrative remedies is met "with a presentation of *all issues* and *arguments* in a party's administrative case brief to Commerce." *Id.* (emphasis added). In fact, the CAFC has rejected a party's attempt to raise an argument for the first time before the Court by claiming that "it is simply another angle to an issue which it did raise." *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

Likewise, this Court has expressly recognized that it "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases" and that "Commerce's regulation gives the exhaustion requirement extra weight." *Ellwood City Forge Co.*, 582 F. Supp. 3d at 1272-73 (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). Accordingly, the exhaustion requirement can only be excused in narrow circumstances. "Examples of these narrow circumstances include when the respondent can demonstrate that raising the issue before the agency would have been futile and when the issue is purely a question of law. . . . Other exceptions to the exhaustion requirement are when a subsequent court decision might affect the agency's decision or when the respondent had reason to believe the agency would not follow precedent." *Zhejiang Mach. Imp. & Exp. Corp.*, 471 F. Supp. 3d at 1338 (internal citations omitted).

Thus, the bar to satisfy the exhaustion doctrine is far from being low and, in the underlying review, YS failed to observe this threshold. YS did not present "all arguments" to Commerce before raising them before this Court. In its case brief, YS argued that Commerce's use of San Shing's financial ratios was improper, based on its (erroneous) claims that (i) San Shing is primarily devoted to automative products, and that (ii) San Shing does not have material sales in the home market of Taiwan. Both claims are related to criteria 1 and 2 under Commerce's analysis set forth in *Magnesium from Israel*. However, the YS Brief includes one additional argument regarding criterion 4 (*i.e.*, the level of similarity between the customer bases of the respondent and the potential surrogate), which Commerce added in *Color TVs from Malaysia* as part of the analysis it follows in selecting surrogate financial statements under 19 U.S.C. § 1677b(e)(2)(B)(iii). *See* Final IDM Comment 1, p. 5 (P.R. 128).

YS's new claim is that San Shing primarily sold its merchandise to actual end users of the automotive bolts (car makers), while YS made sales primarily to distributors. YS Brief at 12-13. In this way, although in its case brief YS questioned the *broad issue* of the selection of San Shing's financial statements as surrogate financial statements, its arguments were related to *Magnesium from Israel* criteria 1 and 2. No mention whatsoever was made with regard to criterion 4. Thus, the reference to criterion 4 constitutes an undeveloped claim and a new argument and, as such, it circumvents the requirements of the exhaustion doctrine and is forfeited. If YS considered that alleged differences in customer bases related to criterion 4 were relevant to Commerce's final determination, it should have included the argument in its case brief, granting the agency the opportunity to address it. Also, raising the issue before the agency was critical considering that, as explained above, Commerce has wide discretion when choosing surrogate financial data. However, not doing so indicates that YS waived the argument on criterion 4 and that, following

this Court's strict interpretations, the claim is precluded from judicial review. YS should have raised all grounds and factors representing its complete set of arguments concerning selection of surrogate financial statements before Commerce.

Additionally, there are no exception to the exhaustion doctrine that appear to apply in this case. No evidence suggests that raising the issue concerning criterion 4 in YS's brief would have been futile, the allegation on criterion 4 is not purely a question of law (it refers to the factual comparison of two customer bases), and nothing in the record indicates that there was a subsequent court decision that could have affected Commerce's determination or that the agency would not follow precedent.

Because YS failed to raise the argument concerning any differences between its customer base and that of San Shing, this argument is precluded under the exhaustion doctrine and, thus, should not be considered by this Court.

**B.  Even if This Court Considers the New Argument, Commerce's Decision is Still Supported by Substantial Evidence on the Record**

Even if the Court decides to consider YS's argument concerning the similarity of the customer base between San Shing and the respondent, there is no evidence on the record that supports YS's claims.

Specifically, YS alleges that San Shing "largely sold fastener merchandise in the form of automotive bolts," that were "largely sold to end-users, such as carmakers, in Europe and the United States." YS Brief at 12-13. YS claims that, by contrast, it only sold to the distributor channel in the United States. *Id.*

The administrative record does not support YS's speculative argument. First, Commerce reviewed the evidence and concluded that San Shing produces and sells fasteners, which are products comparable to steel nails. Final IDM at Comment 1, p. 6 (P.R. 128). Second, while

different types of fasteners may be sold to different customers, the record does not support YS's exaggerated claim that San Shing "largely sold fastener merchandise in the form of automotive bolts." *See* YS Brief at 12-13. Excerpts of San Shing's website show that the company produces, among other types of fasteners, such as bolts, nuts, and washers, automotive bolts that are sold to carmakers. *See* Mid Continent CV Profit Comments at Exhibit 3 (P.R. 82). Its fastener business accounted for 87% of its revenue in 2022. *See id*. at Exhibit 4, p. 62 (P.R. 82). Nowhere does San Shing represent that most of its fastener sales are in the form of automotive bolts to carmakers in Europe and the United States. *See id.* at Exhibits 3 and 4, p. 62 (P.R. 82).

Finally, Commerce selected the best available evidence on the record through application of prong (iii) under the statute and application of the factors under its longstanding methodology. Even where certain evidence could be interpreted differently, Commerce's selection of surrogate financial data must be sustained unless it is unsupported by substantial evidence on the record. *See Zhejiang DunAn*, 652 F.3d at 1341 ("{The} court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information."). Plaintiff's unsupported allegation that San Shing's customer base differs from its own is insufficient to call Commerce's decision into question.

## V.     CONCLUSION

For the reasons set forth above, the Court should deny YS's Motion for Judgment on the

Agency Record and find that Commerce's Final Results are supported by substantial evidence and

otherwise in accordance with law.

Dated:  November 1, 2024

Respectfully submitted,

*/s/ Rosa S. Jeong*
Rosa S. Jeong
Claudia Hartleben Dunsch
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC  20037
(202) 331-3100 (Phone)

*Counsel for Defendant-Intervenor*
*Mid Continent Steel & Wire, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and 2(B)(2), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Response of Defendant-Intervenor in Oppositoin to Plaintiffs' Motion for Judgment on the Agency Record, as computed by the word count function of the word processing system used to prepare the brief, is 6,232 words (not including table of contents, table of authorities, counsel's signature block and this certificate).

Dated:  November 1, 2024

Respectfully submitted,

*/s/ Rosa S. Jeong*
Rosa S. Jeong
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC  20037
(202) 331-3100 (Phone)

*Counsel for Defendant-Intervenor*
*Mid Continent Steel & Wire, Inc.*